IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 13-cv-02601-LTB

NICK J. ALVARADO,

        Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

        Defendant.

_____

**ORDER**

_____

       Plaintiff Nick Alvarado appeals the final decision of the Commissioner of Social Security

("SSA") denying him disability benefits under Title II of the Social Security Act, 42 U.S.C. §

401, *et seq.*  I have considered the briefs [Docs. # 16, 21, 22] and the administrative record [Doc.

# 13] ("AR").  Oral argument would not materially assist me in determining this appeal.  Mr.

Alvarado contends that the administrative law judge ("ALJ") erred in various respects in

determining his residual functional capacity ("RFC") at step four of SSA's sequential process for

evaluating disability.  Mr. Alvarado argues that this improper RFC determination tainted the

ALJ's determination at step five that Mr. Alvarado's RFC and other factors allow him to do

work in the national economy and, therefore, that he is not disabled.  I conclude that the ALJ did

not err in determining Mr. Alvarado's RFC, and that his determination is supported by

substantial evidence.  Accordingly, I **AFFIRM**.

## I.  Background

### A.  Procedural History

Mr. Alvarado filed his claim with SSA on July 14, 2010, alleging he became disabled on May 22, 2010.  AR 24.  SSA denied his claim initially on December 15, 2010.  *Id.*  Mr. Alvarado requested a hearing.  *Id.*  The hearing took place on April 23, 2012, before an ALJ.  *Id.*  On May 1, 2012, the ALJ denied Mr. Alvarado's claim, concluding that Mr. Alvarado was not disabled within the meaning of the Social Security Act.  AR 38.  On May 10, 2012, Mr. Alvarado requested that SSA's Appeals Council review the ALJ's decision.  AR 19.  On June 3, 2013, the Appeals Council denied review, making the ALJ's decision the final decision of SSA.  AR 4; *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).  By letter dated August 20, 2013, the Appeals Council extended the 60-day deadline for Mr. Alvarado to appeal the agency's final decision, allowing him 30 days from his receipt of the letter to do so.  AR 1.  SSA stated that it presumed Mr. Alvarado would receive the letter within five days, or by August 25, 2013.  *Id.*  On September 23, 2013, Mr. Alvarado timely filed the instant appeal.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

### B.  Mr. Alvarado's Alleged Conditions

The following facts are undisputed unless otherwise noted.  Mr. Alvarado was born in 1969.  AR 210.  His recent work history includes an environmental health position in the military that he held from 1991 to 1999.  AR 224.  From 2000 to 2008, he worked as a project coordinator in the private sector.  *Id.*  During this period, he obtained a college degree in information technology.  *Id.*  From 2009 to 2010, he worked as a test engineer for an information technology company.  *Id.*  He was laid off from his job on August 17, 2010.  AR 58.  Mr.

Alvarado's appeal focuses on his spinal issues and his mental conditions, which consist of anxiety, depression and panic attacks.

### 1. Spinal Issues

Mr. Alvarado's history of spinal problems dates back to 1992, when he fell and hit his back on a sharp edge. AR 91. In 1999, he injured his back playing basketball. *Id.* At that time, doctors diagnosed him with spondylolisthesis at the L5-S1 level and he underwent lumbar fusion surgery. *Id.* In 2005, doctors performed a second lumbar fusion surgery. *Id.* A 2008 MRI showed postoperative changes at the L5-S1 level associated with degenerative joint disease and degenerative disc disease; partial dessication at the L3-4 level with mild disc space loss; and probable spondylolysis at the L5 verterbra. *Id.*

A March 2010 CT scan showed that Mr. Alvarado had slight degenerative symptoms with no evidence of nerve root compression. AR 313-14. In June 2010, John Bissell, M.D., a pain management doctor, observed on examination that Mr. Alvarado's legs were almost at full strength and that he had full strength throughout the rest of his body. AR 286-87. He had normal sensation, gait, and station, but did have tenderness and reduced range of motion in his back. *Id.*

In July and August of 2010, Mr. Alvarado had neurosurgery consultations at the Department of Veterans Affairs ("VA"). AR 340-41. On examination, Glenn Kindt, M.D., and his team noted that Mr. Alvarado had a positive bilateral straight leg raise and some spinal stenosis at the L4-5 level. *Id.* However, they noted that the stenosis was not severe, that Mr. Alvarado's motor functioning was intact, and that he had no nerve root irritation. AR 340-41, 349. They assessed chronic back and leg pain but noted that further surgeries were not

recommended.  *Id.*

On a pain questionnaire submitted with his claim, Mr. Alvarado wrote that he experienced "constant" pain in his lower back and right leg "everyday and all day."  AR 242.  He indicated that prescription narcotics provided "fair" relief, although he noted they "slo[w] my mental decision making."  AR 242.  He also noted that he had received cortisone injections and indicated that they "last for a while but [the] pain always returns within a few weeks."  *Id.*  At the hearing, Mr. Alvarado stated that his pain medication "helps" but "doesn't take [the pain] completely away."  AR 67.

Mr. Alvarado also noted on his pain questionnaire that his pain is worsened by lifting, bending, reaching, and leaning left or right.  AR 242.  On his function report, he indicated he has trouble "stand[ing] much" and "reaching left or right," and that he is "[n]ot able to bend, stoop, reach, [or] lift items," or "kneel down like I used to."  AR 244.  He has no problems with personal care, except for putting on his socks and shoes.  AR 245.  He makes his own meals, does small loads of laundry, drives a car, shops, and uses his computer.  AR 245-48.  He can no longer mow his lawn.  AR 247.  At the hearing, Mr. Alvarado testified that he walks his dog to the park for exercise.  AR 64.  He has a driver's license and drove to the hearing.  AR 56-57. Family members help him clean his house and rake leaves in the fall.  *Id.*

In December 2010, state agency physician Alicia Blando, M.D., reviewed the record to assess Mr. Alvarado's physical impairments.  Dr. Blando noted that Mr. Alvarado's functioning was consistent with sedentary work at that time, but that it would be consistent with light work by May 22, 2011, which is 12 months after the alleged onset date.  AR 95-99.  She noted that he would be able to stand and/or walk a total of four hours in an eight hour day and sit for six hours,

4

among other limitations.  *Id.*

In January 2012, consultative examiner Kimberly Jackson, M.D., examined Mr. Alvarado.  AR 596-601.  She noted Mr. Alvarado "appeared to sit comfortably during the exam and without pain mitigating movement," although he did have significant discomfort getting on and off of the examination table and removing his shoes.  *Id.*  She observed somewhat ataxic ambulation; a reduced range of motion in the dorsolumbar spine with moderate discernible discomfort; moderate tenderness to palpation over the thoracic, lumbar, and sacral spinous processes; and tenderness in the sacroiliac joint.  *Id.*  She noted he had no sensory deficits, although she was unable to obtain his reflexes in all areas.  *Id.*  He had normal strength in his bilateral upper extremities, and a rating of four out of five in his bilateral lower extremities.  *Id.*  Based on her findings, Dr. Jackson assessed that Mr. Alvarado was able to walk for 2 hours in an 8 hour workday with breaks every 15 minutes; to sit for 4 hours with breaks every 20 minutes; and to stand for 2 hours with breaks every 5 minutes.  *Id.*  She recommended against bending, stooping, squatting, and crouching, and recommended that Mr. Alvarado use an assistive device based on his reports of falling down stairs.  *Id.*

### 2. Psychological Issues

In April 2010, Mr. Alvarado saw VA psychiatrist Gary Kielpikowski, M.D., and complained of depression, anxiety, and panic attacks related to his physical pain, impending divorce, and financial problems.  AR 373.  He reported a stable mood, but noted he had been experiencing an increased heart rate, shortness of breath, and dizzy feelings, particularly in closed places.  *Id.*  Dr. Kielpikowski noted Mr. Alvarado had a full affect; focused and organized thoughts; and a good mood.  *Id.*  He also noted Mr. Alvarado was social and conversive and had

no suicidal or homocidal ideation.  *Id.*  Dr. Kielpikowski assessed major depression complicated

by panic attacks, social stresses, and chronic pain.  *Id.*  Dr. Kielpikowski prescribed the

antidepressant Zoloft and the sleep aid Ambien.  *Id.*

In May 2010, Mr. Alvarado saw Thomas Johnson, D.O., who assessed depression with

anxiety and insomnia.  AR 438.  Dr. Johnson prescribed Valium, an anti-anxiety medication, and

Prozac, an antidepressant.  *Id.*  In June 2010, Mr. Alvarado mentioned to Dr. Bissell, his pain

management doctor, that he had experienced a panic attack at work.  AR 286.  In July 2010, Mr.

Alvarado saw Dr. Kielpikowski again.  AR 364.  The doctor noted Mr. Alvarado had an "OK"

mood and that he was social and conversive.  AR 365.  In August 2010, Mr. Alvarado saw Dr.

Johnson again.  Dr. Johnson refilled the Valium prescription, noting it worked well not only for

Mr. Alvarado's anxiety, but also his spasms and back pain.  AR 416.

In October 2010, Dr. Kielpikowski completed a "Mental Residual Functional Capacity

Questionnaire" for Mr. Alvarado.  AR 585-90.  He indicated that Mr. Alvarado had a lack of

interest, low energy, sleep problems, high anxiety, and dysphoria, and that he was experiencing

weekly panic attacks.  AR 586-87.  Among other things, the form contained a checklist of

"mental abilities and aptitudes needed to do semiskilled and skilled work."  AR 589.  The doctor

indicated Mr. Alvarado was "unable to meet competitive standards" in several areas and was

"seriously limited, but not precluded" in one area.  *Id.*  Dr. Kielpikowski also commented that

Mr. Alvarado "continues to have severe problems despite medications and therapy."  AR 586.

He assigned Mr. Alvarado a Global Assessment of Functioning ("GAF") score of 49.  See Amer.

Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders at 32 (4th ed. 1994)

("DSM-IV").  A GAF score of 49 indicates "serious symptoms (*e.g.*, suicidal ideation, severe

obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job)." *Id.*

In November 2010, consultative psychological expert LeAnna DeAngelo, Ph.D., examined Mr. Alvarado. AR 554. She diagnosed him with anxiety due to his back pain, and with panic attacks. AR 555. She noted "some evidence" of impairment in Mr. Alvarado's judgment and reasoning. *Id.* However, she noted that his memory, concentration, general fund of information, and abstract thinking were all consistent with his level of education. *Id.* She assigned him a GAF score of 70, which indicates "[s]ome mild symptoms (*e.g.,* depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.,* occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

At the hearing, which took place in April 2012, the ALJ elicited testimony from psychologist Robert Pelc, Ph.D., in an effort to resolve the differences between the opinions of Dr. Kielpikowski and Dr. DeAngelo. AR 47-54. Dr. Pelc testified that, with respect to the four functional areas SSA considers in evaluating the severity of a mental impairment, Mr. Alvarado was only mildly restricted in activities of daily living; was moderately restricted in social functioning; was moderately restricted in concentration, persistence, or pace; and had experienced no episodes of decompensation. AR 47-48. Dr. Pelc explained that by "moderately" he meant Mr. Alvarado has "more than a slight limitation" but "would be capable of satisfactory functioning in those areas" for eight hours a day, five days a week. AR 49. Dr. Pelc explained that he had considered Dr. Kielpikowski's assessment of weekly panic attacks and a GAF score of 49, but did not credit these opinions because they were not supported by any

other medical records.  AR 52-54.

On his function report, Mr. Alvarado did not check boxes indicating that his conditions affected his ability to concentrate, complete tasks, see, remember, understand, follow instructions, or get along with others.  AR 249.  He reported he had "been having a lot of anxiety attacks in public" but said he would "take a Valium when they happen."  AR 250.  He noted he was able to pay bills, count change, handle a savings account, and use a checkbook and money orders.  AR 247.  He reported shopping and spending time with others.  AR 247-48.  At the hearing, Mr. Alvarado testified that "due to the level of my anxiety[,] I usually [shop] in the evening time" and that crowds can cause him to have panic attacks.  AR 56, 61-63.  He added that "everyday stuff . . . can cause stress on me," and that stress can also cause him to have panic attacks.  AR 62-63.

## II.  Legal Standards

### A.  SSA's Five-Step Process for Determining Whether a Claimant Is "Disabled"

A claimant is "disabled" under Title II of the Social Security Act if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  SSA has established the following five-step sequential evaluation process for determining whether a claimant is disabled and thus entitled to benefits.  20 C.F.R. § 404.1520.

At step one, SSA asks whether the claimant is presently engaged in "substantial gainful activity."  If he is, benefits are denied and the inquiry stops.  *Id.* § 404.1520(b).  At step two,

SSA asks whether the claimant has a "severe impairment"—that is, an impairment or combination of impairments that "significantly limits [his] physical or mental ability to do basic work activities." *Id.* § 404.1520(c).  If he does not, benefits are denied and the inquiry stops.  If he does, SSA moves on to step three, where it determines whether the claimant's impairment(s) "meet or equal" one of the "listed impairments"—impairments so severe that SSA has determined that a claimant who has them is conclusively disabled without regard to the claimant's age, education, or work experience.  *Id.* § 404.1520(d).  If not, SSA goes to step four.

At step four, SSA determines the claimant's residual functional capacity ("RFC"), *i.e.,* what he is still able to do despite his impairments, and asks whether the claimant can do any of his "past relevant work" given that RFC.  *Id.* § 404.1520(e).  If not, SSA goes to the fifth and final step, where it has the burden of showing that the claimant's RFC allows him to do other work in the national economy in view of his age, education, and work experience.  *Id.* § 404.1520(g).  At this step, SSA's "grid rules" may mandate a finding of disabled or not disabled without further analysis based on the claimant's age, education, and work experience.  20 C.F.R. Pt. 404, Subpt. P, App. 2.  In contrast with step five, the claimant has "the burden of establishing a prima facie case of disability at steps one through four."  *Doyal*, 331 F.3d at 760.

**B.  Standard for Reviewing SSA's Decision**

My review is limited to determining whether SSA applied the correct legal standards and whether its decision is supported by substantial evidence in the record.  *Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000).  With regard to the law, reversal may be appropriate when SSA either applies an incorrect legal standard or fails to demonstrate reliance

on the correct legal standards. *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). With regard to the evidence, I must "determine whether the findings of fact . . . are based upon substantial evidence, and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon [this] court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). I may not re-weigh the evidence or substitute my judgment for that of the ALJ. *See Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987); *Cagle v. Califano*, 638 F.2d 219, 220 (10th Cir. 1981).

### III.  The ALJ's Decision

The ALJ followed the five-step analysis outlined above. At step one, the ALJ found that Mr. Alvarado has not engaged in substantial gainful activity since the alleged onset date of his conditions, May 22, 2010. AR 26. At step two, the ALJ found the following severe impairments: "degenerative disc disease of the lumbar spine, status post laminectomy and fusion; affective disorder; and anxiety disorder." *Id.* At step three, the ALJ concluded that Mr. Alvarado did not meet or equal any of the listed impairments. AR 27.

At step four, the ALJ assessed Mr. Alvarado's RFC. The ALJ limited Mr. Alvarado to light work as defined in 20 C.F.R. § 404.1567(b). AR 28. Further, the ALJ concluded he could

stand and/or walk for four hours and sit for six hours in an eight hour workday provided he has the ability to alternate between postures as needed.  *Id.*  The ALJ concluded he could push and pull with his upper and lower extremities within the aforementioned exertional level.  *Id.*  The ALJ concluded he could not balance or climb ladders, ropes, or scaffolds, but could occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs.  *Id.*  The ALJ added that he should avoid concentrated exposure to extreme cold, vibration, and hazards, such as unprotected heights or major manufacturing machinery.  *Id.*  Finally, the ALJ limited Mr. Alvarado to semi-skilled work "due to his mental impairments and pain complaints."  AR 28, 35.  The ALJ determined that this RFC did not permit Mr. Alvarado to perform any past relevant work.  AR 37.

At step five, the ALJ concluded Mr. Alvarado's age, education, work experience, and RFC enabled him to perform jobs that exist in significant numbers in the national economy.  *Id.*  Specifically, the ALJ relied on testimony by a vocational expert that someone with the RFC the ALJ assigned to Mr. Alvarado could work in such jobs as front desk receptionist, receptionist, and clerical sorter.  AR 38.

## IV.  Analysis

### A.  The ALJ's RFC Assessment

Mr. Alvarado argues that the ALJ should have adopted a more restrictive RFC.  He highlights various pieces of evidence that he believes the ALJ overlooked or did not adequately credit in regard to both his exertional and nonexertional limitations.  I address the evidence related to each type of limitation in turn.

#### 1.  Evidence Related to Exertional Limitations

Mr. Alvarado first argues that Dr. Blando's opinion regarding his ability to perform light

11

work is "conflicted" and that the ALJ should have addressed this fact. Opening Br. at 11 [Doc. #
16]. As noted, Dr. Blando, a state agency physician, opined that, while Mr. Alvarado could only
perform sedentary work when she evaluated him in December 2010, his functioning would be
consistent with light work by May 22, 2011, which is 12 months after the alleged onset date. AR
95-99; *see* 42 U.S.C. § 423(d)(1)(A) (to be "disabled," claimant's impairments must be
"expected to last for a continuous period of not less than 12 months" or to result in death). Mr.
Alvarado takes issue with a statement that appears within the same document as Dr. Blando's
opinion indicating that Mr. Alvarado's "maximum sustained work capability" is "sedentary."
AR 98. This statement was made by Shu Ying Xue, a non-physician employee of the state
agency, not Dr. Blando. In any event, that employee also wrote in a narrative following the
statement in question that Mr. Alvarado is a "40 y/o male w/ severe conditions now but by
5/22/11 he is projected w/ a narrow light RFC," which is consistent with Dr. Blando's opinion.
AR 99. Mr. Alvarado also argues that, while the ALJ said he "accepts Dr. Blando's assessment
as representative of the claimant's true, physical residual functional capacity," AR 34, the ALJ
failed to note that Dr. Blando's assessment was a projection. Mr. Alvarado does not argue,
however, that it was improper for the ALJ to rely on a projection. This argument also is without
merit. Dr. Blando's written opinions, which the ALJ cited extensively, make clear that they are
projections. See AR 95-99.

Relatedly, Mr. Alvarado contests the ALJ's adoption of the exertional limitations
assigned by Dr. Blando rather than those assigned by Dr. Jackson, a physician who examined
Mr. Alvarado a single time. Most significantly, Dr. Jackson opined that Mr. Alvarado could sit
for four hours, stand for two hours, and walk for two hours, all in an eight hour workday, and

would require breaks as frequently as every five minutes.  AR 596-601.  Dr. Blando was not so restrictive, assigning sitting, standing, and walking figures of six, four, and four, respectively, with "normal breaks."  AR 95.  The ALJ explained that he gave "little weight" to Dr. Jackson's assessment because she "seemed to accept uncritically as true most, if not all, of what the claimant reported" regarding his symptoms, despite a lack of support in the record.  AR 35.  For example, Dr. Jackson noted that Mr. Alvarado "s[a]t comfortably during the examination and without pain mitigating movements," yet she assigned him a restrictive limitation on sitting.  AR 598, 600.  Further, Dr. Jackson recommended that Mr. Alvarado use an assistive device based on his report to her that he falls frequently, yet there appears to be no evidence of falling in other medical records.  AR 600-01.  The ALJ also noted that Dr. Jackson examined Mr. Alvarado only once.  AR 35.

While "the opinion of a treating physician concerning the nature and extent of a claimant's disability is entitled to controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the claimant's] case record . . . [a]n ALJ may disregard a treating physician's opinion [where] it is not so supported."  *Doyal*, 331 F.3d at 762 (internal quotations and citations omitted).  Here, the ALJ thoroughly explained why he found Dr. Jackson's opinions lacking in support and in conflict with other evidence in the record.  Accordingly, the ALJ did not err in giving little weight to Dr. Jackson's opinions.  Mr. Alvarado's contention that the ALJ had to credit all of Dr. Jackson's opinions if he credited any of her opinions—and his similar argument with respect to other medical opinions in the record—is likewise without merit.  *See Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (rejecting argument that "the

components of an RFC assessment lack substantial evidentiary support unless they line up with an expert medical opinion").

Finally, Mr. Alvarado alleges various other pieces of evidence he contends the ALJ "ignored" in determining his exertional limitations: "positive x-rays of the knees and of the hips . . . bilateral knee retropatellar syndrome, with bilateral DJD [degenerative joint disease] . . . lumbago and hip joint pain . . . [and] SI [sacroiliac] joint dysfunction." Opening Br. at 16-17 [Doc. # 16] (citations to record omitted). Mr. Alvarado has not disputed that neither he nor his counsel alleged knee impairments to the state agency or the ALJ. The ALJ cannot be faulted for not considering an allegation that Mr. Alvarado never made. *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004) (noting that the "burden to prove disability in a social security case is on the claimant" and that, while the "ALJ bears responsibility for ensuring that an adequate record is developed during the disability hearing consistent with the issues raised," the ALJ "should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored") (internal quotations and citations omitted). With regard to hip and sacroiliac joint pain, medical records indicate Mr. Alvarado experienced it, but only from approximately May 2010 to July 2010, during which time he received an injection of pain medication into his "right hip/iliac crest" area. AR 265-67. Later relevant records suggest that the pain abated. For example, Mr. Alvarado did not complain of pain in this area during his examination by Dr. Jackson. AR 596-601. In addition, he did not complain of pain in this area in his pain questionnaire, dated September 2010. AR 242. Further, Mr. Alvarado has not disputed that his pain in this area was only temporary. A condition that lasts for three months cannot support a disability claim by itself. *Barnhart v. Walton*, 535 U.S.

14

212, 219, 221-22 (2002) (impairment or combination of impairments must prevent work for at least 12 consecutive months); *accord* 20 C.F.R. § 404.1522.  Accordingly, this argument is also without merit.

### 2.  Evidence Related to Nonexertional Limitations

Mr. Alvarado argues that the ALJ should have found that he has greater nonexertional limitations due to his anxiety, depression, panic attacks, and pain.  *See Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993) ("pain or mental problems" are nonexertional impairments).  As noted above, the ALJ adopted the opinion of Dr. Pelc, a non-treating physician, that while Mr. Alvarado was mildly restricted in activities of daily living and moderately restricted in social functioning and in concentration, persistence, or pace, he was capable of performing at least satisfactorily in these areas during a full 40-hour workweek.  The ALJ nonetheless "elect[ed] to adopt a restriction, limit[ing] the claimant to semi-skilled work, according him a lower skill level due to his mental impairments and pain complaints."  AR 35.  The ALJ did not otherwise adopt nonexertional limitations.  Mr. Alvarado makes several arguments about why the RFC insufficiently accounts for Mr. Alvarado's mental impairments and pain, which will I address in turn.

First, Mr. Alvarado argues that the ALJ improperly analyzed and resolved the conflict between Dr. Kielpikowski's opinion, on the one hand, and Dr. DeAngelo's and Dr. Pelc's opinions on the other.  As the ALJ noted, the opinions of Dr. DeAngelo, the consultative examiner, were consistent with Dr. Pelc's in that they indicated that Mr. Alvarado's psychological impairments were not severe.  For example, Dr. DeAngelo assigned Mr. Alvarado a GAF score of 70, indicating mild symptoms.  On the other hand, Dr. Kielpikowski, a treating

physician, assigned Mr. Alvarado a GAF score of 49, indicating "serious" symptoms, and noted he was "unable to meet competitive standards" in several areas of mental functioning and was "seriously limited, but not precluded" in another.  AR 585-90.  As noted above, an ALJ may reject an opinion of a treating physician in favor of a non-treating physician's opinion where the treater's opinion is not supported by medically acceptable clinical or laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record.  *Doyal*, 331 F.3d at 762.  Here, the ALJ gave little weight to Dr. Kielpikowski's opinion because the form he completed "consists of 'check the box' type answers" and he "failed to provide any accompanying narration to describe how he reached his conclusions."  AR 36.  Further, the ALJ noted that Dr. Kielpikowski's conclusions were inconsistent with other evidence in the record, including VA treatment notes reflecting a complete lack of the severe symptoms that Dr. Kielpikowski noted.  *Id.*  Therefore, the ALJ had sufficient grounds to reject Dr. Kielpikowski's opinions in favor of the opinions of Dr. DeAngelo and Dr. Pelc.

Second, Mr. Alvarado contests the ALJ's evaluation of the credibility of Mr. Alvarado's own statements regarding his conditions.  As noted above, Mr. Alvarado stated he experienced anxiety, panic attacks, and pain, and described the effects these conditions have on his daily activities.  The ALJ did not find Mr. Alvarado's statements entirely credible.  AR 30.  Among other reasons, the ALJ noted that treatment records from Dr. Johnson, a treating physician, indicated Mr. Alvarado's anxiety was well controlled with Valium, belying Mr. Alvarado's claim that his mental impairments precluded him from working.  AR 32.  As to Mr. Alvarado's complaints of pain, the ALJ noted they were inconsistent with the objective medical evidence, including repeated imaging showing no spinal cord compression or nerve root impingement.  *Id.*

16

Further, the ALJ noted that Mr. Alvarado had reported experiencing relief from his prescribed pain medications. *Id.* The ALJ also noted evidence in the record suggesting that Mr. Alvarado's pain complaints may be connected with "drug-seeking behavior," including instances where he obtained narcotic medications from multiple providers contemporaneously without notifying the providers that he was doing so. AR 31. Based on the foregoing, I conclude that the ALJ's finding that Mr. Alvarado's statements are of limited value is supported by substantial evidence. *See White*, 287 F.3d at 909-10 (noting that claimant's admission that medication relieved some of her pain supported ALJ's finding that impairments were not as disabling as claimed and explaining that the "ALJ's credibility findings warrant particular deference" and should not be upset "[s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility"); *Poppa v. Astrue*, 569 F.3d 1167, 1171-72 (10th Cir. 2009) (ALJ properly relied upon evidence that claimant had exhibited drug-seeking behavior in assessing claimant's credibility).

Third, Mr. Alvarado contends that the ALJ was required to incorporate Dr. Pelc's opinion that Mr. Alvarado was moderately limited in social functioning and in concentration, persistence or pace into the ALJ's RFC assessment. This argument is without merit. Testimony regarding restrictions in these "broad categories"—which are used earlier in the sequential evaluation process to determine whether the claimant has a severe impairment and whether that impairment meets or equals a listed impairment—does not necessarily translate into the "more detailed RFC determination" at step four. *Bales v. Colvin*, 576 F. App'x 792, 797-98 (10th Cir. 2014); *see also* SSR 96-8P, 1996 WL 374184 (July 2, 1996). Dr. Pelc's own testimony illustrates this point; he testified that the moderate restrictions noted above did not preclude Mr. Alvarado from

satisfactorily performing a full-time job.  AR 47-49.  Mr. Alvarado relies upon a case where the ALJ completely failed to discuss medical opinion that the claimant was moderately limited in her social functioning and in concentration, persistence, or pace.  *See Frantz v. Astrue*, 509 F.3d 1299, 1303 n.3 (10th Cir. 2007).  As the Tenth Circuit noted, however, the ALJ's error in that case was in failing to include such limitations "without discussion."  *Id.* at 1302-03.  Here, as noted, the ALJ discussed the restrictions and noted Dr. Pelc's belief that they would not prevent Mr. Alvarado from satisfactorily performing a full-time job.  AR 35.  Accordingly, the ALJ did not err in declining to include them in the RFC.

Finally, in his reply brief, Mr. Alvarado contests the ALJ's restricting him to semi-skilled work "due to his mental impairments and pain complaints" on the grounds that "[t]ailoring or translating specific mental limitations into a skill" is improper.  Reply Br. at 3-4 [Doc. # 22]; AR 35.  Mr. Alvarado did not make this argument in his opening brief and, in fact, objected that while "[t]he concentration restriction became a limitation to semi-skilled work . . . no limitation was given with regard to social functioning persistence or pace."  Opening Br. at 12 [Doc. # 16].  A "party waives issues and arguments raised for the first time in a reply brief."  *Colorado Rail Passenger Ass'n v. Fed. Transit Admin.*, 843 F. Supp. 2d 1150, 1171 (D. Colo. 2011) (quoting *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n. 7 (10th Cir. 2009)).  Accordingly, I find that Mr. Alvarado waived this argument and will not address it.

For these reasons, I am not persuaded that the ALJ erred in determining Mr. Alvarado's RFC, or that his determination is not supported by substantial evidence.  While Mr. Alvarado highlights evidence that would support a more restrictive RFC, where, as here, the ALJ followed the "specific rules of law that must be followed in weighing particular types of evidence in

disability cases" and his decision is supported by substantial evidence, I must affirm.  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotations and citations omitted); *see also id.* ("We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.").

### B.  The ALJ's Conclusion at Step Five

Mr. Alvarado argues that the ALJ's improper RFC determination tainted his ultimate conclusion at step five—that Mr. Alvarado's RFC allows him to do other work in the national economy in view of his age, education, and work experience, and, therefore, that he is not disabled.  *See* 20 C.F.R. § 404.1520(g).  Mr. Alvarado has not identified any errors at step five independent of the ALJ's reliance on an incorrect RFC assessment.  Because I have rejected Mr. Alvarado's claims of error with respect to the RFC, I also uphold his conclusion at step five.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (rejecting argument that ALJ erred at step five because claimant's argument "simply restates her argument that the ALJ's RFC finding did not account for all her limitations").

### V.  Conclusion

For the foregoing reasons, SSA's decision is **AFFIRMED**.


DATED:  March   31  , 2015, at Denver, Colorado.

BY THE COURT:


  s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE
